IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL BLAKE, ANDREA JOHNSON and JOHN ZARAK, | ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 09-1182 |
| vs. | ) ) | |
| PENN STATE UNIVERSITY GREATER ALLEGHENY CAMPUS, | ) ) ) | |
| Defendants. | ) ) ) | |

AMBROSE, Senior District Judge

## OPINION AND
## ORDER OF THE COURT

### <u>Synopsis</u>

Defendant Penn State University Greater Allegheny Campus ("PSU") moves for summary judgment dismissing all claims against it. Plaintiffs worked as maintenance workers for PSU on its Allegheny Campus. Plaintiff Michael Blake ("Blake") claims that he was discriminated against and suffered a hostile work environment based on his race, and retaliated against for complaining about this treatment. Plaintiff Andrea Johnson ("Johnson") also alleges that she suffered discrimination and a hostile work environment based on racial familial association and in retaliation for her complaints. Plaintiff John Zarak ("Zarak") claims that he suffered a hostile work environment and was retaliated against for complaining about the discriminatory treatment of Blake and Johnson. Plaintiffs' claims are asserted under Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act ("PHRA") and 42 U.S.C.

§1981.  For the reasons set forth below, I grant Defendant's motion in its entirety.

## I.  Legal Standard

In order to prevail on a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue of material fact and. . .the moving party is entitled to judgment as a matter of law."  Jurimex Kommerz Transit G.M.B.H. v. Case Corp., 2007 WL 2153278, at *1 (3d Cir. July 27, 2007) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the party opposing a motion for summary judgment bears the ultimate burden of proof, the moving party may discharge its initial burden of showing that there is no genuine of material fact by showing - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Player v. Motiva Enter., LLC, 2007 WL 2020086, at *9 n.4 (3d Cir. July 13, 2007).  "If the moving party has satisfied its initial burden, the nonmoving party must, in their opposition to the motion, identify evidence of record that creates a genuine issue of material fact."  Id.  Moreover, "[t]o defeat a motion for summary judgment, the non-moving party must 'do more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.' " Jurimex Kommerz Transit G.M.B.H., 2007 WL 2153278, at *1  (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

## II. Statement of Relevant Facts[1]

Plaintiff Blake, an African-American male, has worked for Defendant since 1983 and has held the position of Grade 9 Maintenance Worker (Utility) C since November 1989. Plaintiff Johnson, a Caucasian female, has worked for Defendant since 1986 and has held the position of Grade 9 Maintenance Worker (General) C since 2003. Plaintiff Zarak, a Caucasian male, has worked for Defendant since 1987. In 1993, he was promoted to Grade 6 Group Leader Landscape, which position was reclassified in 1998 to include janitorial responsibilities.

All three Plaintiffs are employed within the administrative unit known as the Office of Physical Plant ("OPP"), and more specifically, work within the OPP Department of Maintenance. OPP is responsible for the day to day maintenance, upkeep and operation of all buildings and grounds, including the utilities infrastructure necessary to support these facilities. Donald Ukasik ("Ukasik") has been employed by Defendant since 1988 and has been Supervisor of Maintenance since 2003. Kirk Urey ("Urey") is Defendant's Director of Finance and Business and chief of human resources. (Docket No. 33-24, at 1.) As such, he is Ukasik's immediate supervisor. (Id.)

Evidence of Racist Speech

Blake never heard Ukasik refer to him or anyone else as "nigger." He did hear Ukasik

---

[1] I have not provided citations to those facts admitted by the parties in their Concise Statements of Material Facts (See Docket Nos. 39, 46 and 50.) In addition, the depositions of Blake, Johnson and Zarak, and Defendant's brief in support of its motion for summary judgment, discuss a multitude of individual incidents and conduct that occurred over the course of Plaintiffs' employment with Defendant. However, many of these incidents are not referred to by Plaintiffs in opposition to Defendant's motion. I must assume, therefore, that they are no longer considered relevant by Plaintiffs to their claims of discrimination, retaliation and hostile work environment. To the extent Plaintiffs have referred, even tangentially, to specific instances, I address them herein or in my discussion of Plaintiffs' claims. Nevertheless, I have carefully considered all of the evidence submitted by the parties in connection with this motion for summary judgment.

call him "Buckwheat" in 2000, before Ukasik became a supervisor. Ukasik invited Blake to be a member of his wedding party, and Blake accepted. (Docket No. 34-1, at 28.) Johnson testified that she heard Ukasik use the word "nigger" one time in the fall of 2008 (although she did not include that incident in her EEOC filings), and once overheard him from twenty feet away refer to Blake as "Buckwheat." (Docket No. 34-2, at 66-68.) Zarak testified that he frequently heard Ukasik use the terms "nigger" and "Buckwheat" in reference to Blake, although he never reported Ukasik's use of these terms to either Defendant or the EEOC. (Docket No. 34-3, at 6-7, 11.) Another employee, Wayne McCusker, testified that he heard Ukasik use the word "nigger" hundreds of time over the past thirty years, but does not recall him ever directing it at anyone. (Docket No. 43-1, at 9-10). Both Zarak and McCusker emphasized that Ukasik made a point of only using such terms in private conversation with them. (Docket No. 34-3, at 8; Docket No. 43-1, at 9-10.) Connie Hopkins, Karen Weckoski, Kay Harvey, Ruth Johnson, Terrie Patton and Melanie Brletic, employees of Defendant who have regular and routine contact with Ukasik, all attested that they have never heard him use the terms "nigger" or "Buckwheat." (Docket Nos. 33-49 through 33-54.)

Johnson testified that, before she was transferred to the Maintenance Department from Food Production, Connie Hopkins told her that Ukasik had stated that he did not want Johnson in his department. (Docket No. 34-2, at 25.) She testified that on the few occasions when her biracial daughter came to her workplace, Ukasik would look at her daughter "funny" and shrug and walk away. (Id. at 46.) She claims that when she showed photographs of her biracial grandchildren to her co-workers, Ukasik made a sound of "dislike and bigotry," gave her a sour look, would roll his eyes and walk away. (Id. at 9-10.)

<u>Plaintiffs' Complaints of Discrimination</u>

On October 16, 2008, Blake filed a Harassment Questionnaire, Union Representation Questionnaire, and Performance Related Discipline Questionnaire with the PHRC. On January 8, 2009, Blake filed his initial verified charge of discrimination with the PHRC. On April 23, 2009, Blake filed a second charge of discrimination with EEOC. On August 17, 2009, Blake filed a third charge of discrimination with the EEOC.

Johnson testified that she and Connie Hopkins met with Defendant's Chancellor, Dr. Porter, in the summer of 2008 to notify him of Ukasik's discriminatory conduct. (Docket No. 43-1, at 729.)[2] On July 28, 2008, Johnson filed an Intake Questionnaire and Harassment Questionnaire with the EEOC. On December 22, 2008, Johnson filed her first verified charge with the PHRC. On June 18, 2009, Johnson filed a second charge of discrimination with the EEOC. On August 17, 2008, she filed her third charge of discrimination with the EEOC.

Zarak submitted an Intake Questionnaire to the EEOC on December 22, 2007. He filed his first charge of discrimination with the EEOC on February 25, 2008, his second charge of discrimination on August 17, 2009 and his third charge of discrimination on September 3, 2009.

<u>Ukasik's Retaliatory Conduct Towards Plaintiffs</u>

a. *Disciplinary Actions against Plaintiffs*

Blake received two disciplinary warning letters and a suspension in March 2005 in connection with his refusal to follow Ukasik's instructions to use old calcium product during snow removal. In July 2007, Blake received a non-disciplinary letter of conversation for his

---

[2] Connie Hopkins does not confirm this meeting, and attests that she has "not observed Donald Ukasik or Kirk Urey or any other representative of Penn State management discriminate against or harass any of the Plaintiffs based on race or gender, or retaliate against any of the Plaintiffs in any way." (Docket No. 33-49, at 2.)

conduct towards a work study student.  During the so-called "Aunt Jemima" incident, the student, an African-American female, had been wearing a handkerchief on her head, and complained that Ukasik had made fun of her by speaking in a southern accent. (Docket No. 34-1, at 26-27.)  Blake did not witness the incident, but approached the student repeatedly afterwards. (Docket No. 33-34.)  She eventually complained to Urey, who issued a letter of conversation to Blake telling him to refrain from addressing the student further.  (Docket No. 33-35.)  Blake has never received another letter of conversation. Blake and Johnson received "below standards" performance evaluations in October 2008.   Zarak received a disciplinary warning letter, subsequently withdrawn, in connection with his verbal exchange with Ukasik following a dispute over a change in parking signs.

Apart from these measures, none of the Plaintiffs received any other disciplinary warning letters, suspensions, demotions, loss of pay or loss of benefits during Ukasik's tenure as supervisor.

b. *Blake's Transfer to the Gymnasium*

In August 2008, Blake's principal area of janitorial responsibility was transferred from the Frable Building conference center to the gymnasium, and Ed Reagan, another Grade 9 Maintenance Worker who had been responsible for the gymnasium, was sent to the Frable Building conference center.  Blake believes that he was transferred in retaliation for his complaints of discrimination.  He stated that Ukasik told him that he was "confined" to the gymnasium. (Docket No. 34-1, at 45.)

Ukasik and Urey attested that the transfer was done to better align Blake's and Reagan's responsibilities with their shift schedules.  (See Docket Nos. 33-1, at 3-5; Docket No. 33-24, at 6-8.)  Blake worked the first shift (from 6:30 a.m. until 3:00 p.m.).  Since the conferences

6

typically occurred between 8:00 a.m. and 5:00 p.m., Blake would have very little time to set up before the conferences and no time to clean up after the conferences. (Id.) Reagan worked the second shift from 2:30 until 11:00 pm, when the gymnasium was heavily used. (Id.) Blake admits that the switch was fair, was within management's rights, and that he was given proper notice of the transfer. (Docket No. 34-1, at 16-19.)

c. *March 2009 Project Cleaning*

During spring break in March 2009, Blake and Johnson were assigned to "project clean" the Main Building. Johnson testified that she believed that she was assigned project cleaning in retaliation for her EEOC complaint. (Docket No. 34-2, at 34.) Johnson was regularly responsible for cleaning the Main Building and she admitted that the work was within her job description. (Id. at 35.) Ukasik explained that he assigned the project cleaning to them because the Grade 10 employees, who might otherwise have done the project cleaning, had just finished another project cleaning assignment in the gymnasium and were behind in their normal work areas. (Docket No. 33-1, at 12-13.)

d. *Tree Planting Assignment*

In July 2009, Ukasik asked Johnson, Zarak and Blake to plant some trees, shrubs and other plants. The work involved digging 2x2 holes in the ground, and they were provided shovels, a pick axe, a tractor and a roto tiller. Plaintiffs admit that the work was within their job description, they had completed similar projects in the past, albeit with smaller trees, and that no one else was available at the time to do the project. (Docket No. 34-1, at 42-44; Docket No. 34-2, at 23-26; Docket No. 34-3, at 20.) Ukasik explained that, due to the presence of underground cables and pipes, he could not provide them with a power auger, as they requested. (Docket No. 33-1, at 16.) All three Plaintiffs claim they were injured just as they started the project and

refused to complete it. (Docket No. 34-2, at 26-27.) Ultimately, Zarak completed the project the next day with the help of student workers. (Docket No. 34-3, at 21.)

Evidence Regarding Ukasik's Behavior Toward Other Employees

The record reflects that there was a lot of tension and disagreement in the work unit, to the extent that at one point Urey got involved and had one on one meetings with each employee and a Human Resource person from Penn State also visited the department. (Docket No. 34-3, at 5-6.) McCusker testified that Ukasik treats "nobody the same" and "I don't know why." (Docket No. 43-1, at 11.) He further testified that Ukasik "goes around trying to get people," that Ukasik was doing a "below poor" job running the department and that his behavior spanned the gamut of all the workers, including McCusker. (Id. at 16, 18-19.) Donna Ondo testified that Ukasik removed the wheels from her office chair, risking a serious fall. (Docket No. 34-5, at 17.) Blake testified that he believed Ukasik had put a nail or screw in Donna Ondo's tire. (Docket No. 34-1, at 48.) Zarak testified that he believed Ukasik had flattened Peggy Signorella's tires. (Docket No. 34-3 at 15.) He further stated in his filings with the EEOC that Ukasik tried to sell prescription drugs to McCusker, who had just returned to work from rehabilitation for drug addiction, and had physically assaulted a female office worker by placing his hands on her throat, choking her and making her cry. (Docket No. 36-23, at 6-7.) Karen Wechoski testified that Ukasik pulled out a knife and asked her to slice his throat with it. (Docket No. 34-4, at 14.)

III. Defendant's Motion for Summary Judgment

A. Section 1981 Claim (Count III)

Blake asserts a claim under section 1981 for race discrimination. As Defendant correctly states, the Third Circuit has held that "no implied right of action exists against state actors under

42 U.S.C. § 1981." McGovern v. City of Philadelphia, 554 F.3d 114, 122 (3d Cir. 2009).

Plaintiffs do no dispute that PSU is a state actor for purposes of section 1981 claims. See

American Future Sys., Inc. v. The Pennsylvania State Univ., 752 F.2d 854, 861 n.24 (3d Cir.

1984), cert. denied, 473 U.S. 911 (1985). Accordingly, Defendant is entitled to summary

judgment dismissing Count III of the Amended Complaint.

**B. Title VII and PHRA Claims[3]**

**1. Blake's Discrimination Claim (Count I)**

As an initial matter, Defendant argues that for purposes of Blake's Title VII

discrimination claim, Blake may not rely on incidents occurring more than 300 days before he

filed an intake questionnaire with the EEOC. (Def. Br. At 11.) Blake filed his initial intake

questionnaire with the PHRC and EEOC on October 16, 2008. (Docket No. 36-1.) Assuming

for purposes of this motion that the intake questionnaire satisfies Blake's filing requirements,

Defendant argues that Title VII claims based on incidents occurring prior to December 21, 2007

and PHRA claims based on incidents occurring prior to April 19, 2008 are time-barred.

In O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006), the Third Circuit held

that, for purposes of Title VII claims other than hostile work environment, a plaintiff may not

rely on discrete acts occurring outside the applicable limitations period. In their opposition brief,

Plaintiffs do not contest the applicable statute of limitations. Accordingly, for purposes of

---

[3] It is well established in the Third Circuit that discrimination, hostile work environment and retaliation claims brought under the PHRA are subject to the same analysis as those claims brought under Title VII. Gomez v. Allegheny Health Svcs., Inc., 71 F.3d 1079, 1084 (3d Cir. 1995), cert. denied, 518 U.S. 1005 (1996) (discrimination); Woodard v. PHB Die Casting, 2007 WL 3257201, at *1 (3d Cir. Nov. 6, 2007) (hostile work environment); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997) (retaliation). Therefore, my analysis, although expressed in terms of Title VII, applies equally to the PHRA claims.

analyzing Blake's Title VII and PHRA claims, I will not consider incidents that occurred prior to December 21, 2007 and April 19, 2008, respectively.[4]

With those time constraints in mind, I turn to my analysis of Blake's race discrimination claims under Title VII and the PHRA. Plaintiffs, including Blake, argue that they are proceeding under a "mixed-motives" theory of discrimination. (Pl. Br. at 20.) Under this theory, "the Supreme Court held that to establish a jury question of a Title VII violation, 'a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex or national origin was a motivating factor for any employment practice.'" Cange v. Philadelphia Parking Auth., 2010 WL 1254337, at *4 (E.D. Pa. Apr. 1, 2010) (quoting Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003)); Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (same). In other words, the plaintiff must demonstrate that (1) the defendant took an adverse employment action against the plaintiff, and (2) race was a motivating factor for the defendant's actions. Id. (quoting O'Donnell v. LRP Publications, Inc., 2010 WL 571894, at *6 (E.D. Pa. Feb. 16, 2010)). While Plaintiffs claim that they have direct evidence of discrimination (Pl. Br. at 19), direct evidence is not required to proceed under this theory. Makky, 541 F.3d at 214.

Defendant argues that it is entitled to summary judgment because, notwithstanding any purported evidence of discrimination, Blake has submitted no admissible evidence that he suffered an adverse employment action because of his race. (Def. Reply Br. at 13, 15). Plaintiffs respond that they suffered adverse employment actions in the form of "changes in the terms or

---

[4] Such incidents include Blake's hearing Ukasik refer to him as "Buckwheat" ten years ago, the alleged failure to receive payment for sick days in 2004 (see Docket No. 39, at 11), Blake's discipline in March 2005 for refusing to use "old calcium" for snow removal (id. at 12), the so-called "Aunt Jemima" incident, and the temporary transfer pay issues. (Id. at 14.)

conditions of their employment." (Pl. Br. at 24.)[5]  Unfortunately, nowhere in their brief do

Plaintiffs expressly identify the nature of the purported changes in the terms or conditions of

their employment.  Instead, they submit an extremely general list of complaints (Pl. Br. at 11),

only one of which contains a citation to the record, and only with respect to Plaintiff Zarak.

Nevertheless, I will attempt to discern the evidentiary basis upon which Blake bases his

opposition to Defendant's motion.

"The Supreme Court has defined an adverse employment action as. . . 'a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits….'"

Woodward v. PHB Die Casting, 2005 WL 3093180, at *6 (W.D. Pa. Nov. 18, 2005) (quoting

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761-62 (1998)), aff'd, 255 Fed.Appx. 608 (3d

Cir. 2007).  In reviewing Plaintiffs' Opposing Statement of Concise Material Facts, the court

identifies several incidents upon which Blake may be relying for purposes of establishing an

adverse employment action:  (1) undue monitoring or stalking by Ukasik; (2) Blake's transfer of

assignment to the gymnasium; (3) that Blake was required to submit detailed work reports; (4)

that Blake was assigned "project cleaning"; and (3) that Blake was assigned to plant trees and

large shrubs.  Examining the record before me, I find as a matter of law that none of these

incidents represent a significant change in the terms or conditions of Blake's employment.

With respect to the monitoring or stalking of Blake, references in the record are very

vague as to the extent and timing of any such behavior.  In any event, such conduct on the part of

---

[5] While Plaintiffs state that they have "now presumptively permanently left the work site based upon disability…due to stress brought about based upon encounters with their immediate supervisor as the etiology of their premature retirements," (Pl. Br. at 2-3), Plaintiffs have not pled and do not argue that they suffered an adverse employment action in the form of a constructive discharge.

an employer does not rise to the level of an adverse employment action. <u>Ferguson v. Deptford Twp.</u>, 2008 WL 5401630, at *5 (D.N.J. Dec. 22, 2008) ("[a]llegations of intense scrutiny, overly critical supervision, unnecessary reprimands or derogatory comments do not constitute an adverse employment action") (citing <u>Buffa v. N.J. State Dep't of Judiciary</u>, 56 Fed.Appx. 571, 576 (3d Cir. 2003)). Moreover, Blake admits in his deposition that Ukasik as his supervisor was entitled to monitor his actions. (Docket No. 34-1, at 165.) Wayne McCusker, Blake's co-worker, testified that Ukasik frequently closely monitored employees that he was "mad at," and that such behavior spanned the gamut of all employees, including McCusker (Docket No. 43-1, at 16-18.) With respect to the detailed work reports, Blake admitted that all employees were required to submit such reports, that he had never seen any other employee's reports and had no basis for knowing whether they were more or less detailed than the reports he was required to submit. (<u>Id.</u> at 187-88.) The project cleaning and shrub planting assignments, two incidents over the course of several years, were admittedly within Blake's job description and are insufficient to constitute a significant change in the terms and conditions of his employment. <u>See</u> <u>Young v. St. James Management, LLC</u>, 2010 WL 4290165, at *12 (E.D. Pa. Oct. 29, 2010) (temporary reassignment does not constitute an adverse employment action).

Blake's assignment to the gymnasium facially presents a slightly more substantive issue. "Loss of money or benefits is not required in order for a change in an employee's working conditions to constitute an adverse action; rather, an adverse employment action might consist of changes in location, duties, perks, or other basic aspects of the job." <u>Woodward</u>, 2005 WL 3093180, at *7 (citing <u>Mondzelewski v. Pathmark Stores, Inc.</u>, 162 F.3d 778, 787 (3d Cir. 1998)). A close reading of the record reveals no evidence that the transfer to the gymnasium constituted an adverse employment action. First, prior to Blake's assignment, the gymnasium

was cleaned by Ed Reagan, a white employee who had the same job grade classification as Blake. (Docket No. 33-1, at 3.) Defendant submits evidence that it decided to switch Blake and Ed Reagen's cleaning assignments to better align their responsibilities with their work schedules. Blake admits that the change in job location was within the administration's contractual rights under the collective bargaining agreement and that it was fair. (Docket No. 34-1, at 61.) He further admits that he was given proper notice of the proposed change in location, despite statements in his EEOC questionnaires to the contrary. He suffered no loss of pay or benefits (docket no. 34-1, at 38), nor is there any evidence that the transfer affected his future career prospects. See McKinnon v. Gonzales, 642 F. Supp.2d 410, 435-36 (D.N.J. 2009) (transfer did not amount to adverse employment action where it did not result in a cut in pay or benefits or affect the employee's future career prospects). Apart from Blake's apparent dislike of being assigned to the gymnasium, there is not a scintilla of evidence in the record to support Blake's contention that such a change in job location was an adverse employment action. See Scott v. New Jersey, 143 Fed.Appx. 443, 446 (3d Cir. 2005) ("a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of [a]n. . .adverse employment action"), cert. denied, 546 U.S. 1174 (2006).

Because Blake has failed to establish that he suffered an adverse employment action as a result of the purported discrimination, he has not met his prima facie burden with respect to his Title VII and PHRA discrimination claims. Accordingly, I grant summary judgment dismissing Count I of the (Second) Amended Complaint.

### 2. Blake's Retaliation Claim (Count II)

"To advance a prima facie case of retaliation, a plaintiff must show that: (1) the employee engaged in protected activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). If the plaintiff satisfies this burden, then the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for adverse employment action. Scott v. Airtran Airways, Inc., 2006 WL 2711654, at *6 (W.D. Pa. Sept. 21, 2006). Assuming the defendant satisfies its burden, then "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that the retaliation was real reason for the adverse employment action." Id. "Accordingly, the employee must produce evidence that the retaliatory animus played a role in the employer's decision making process and that it had a determinative effect on the outcome of that process." Id. (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997)).

Plaintiffs argue collectively that they suffered an adverse employment action "in that their work assignments became burdensome, they were subjected to supervisory monitoring, or because of negative employment evaluations." (Pl. Br. at 22.) Defendant argues that Plaintiffs "simply fail to present sufficient evidence of a causal link between their administrative complaints and any alleged materially adverse action taken against them." (Def. Br. at 22.)

An action is "materially adverse" if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Hare v. Potter, 220 Fed.Appx. 120, 128 (3d Cir. 2007)(quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). With respect to Blake, his assignment to the gymnasium, the non-disciplinary letter of

conversation and his negative performance evaluation all occurred *prior* to the first instance of protected activity supported by the record, his PHRC intake questionnaire on October 16, 2008. Using that date as a starting point, the only alleged employer actions which are available to support Blake's retaliation claim are the close supervision of his work by Ukasik, being assigned to project cleaning in March 2009 and the tree planting assignment in July 2009. Similar to Plaintiff's discrimination claim discussed in subpart 2 above, none of these incidents constitute an adverse action by Defendant as a result of Blake's complaint of discrimination.

A supervisor's close scrutiny of an employee's work, "while unpleasant and annoying," does not rise to the level necessary to support a Title VII retaliation claim. Martinelli v. Penn Millers Ins. Co., 2008 WL 723973, at *3 (3d Cir. Mar.18, 2008); McKinnon, 642 F. Supp.2d at 428 (that supervisor "intensified her supervision of [p]laintiff…and micro-managed his whereabouts" fails to rise to the level of material adversity for purposes of retaliation claim). With respect to the tree planting assignment, Blake admits that he had been asked to perform similar assignments in the past, although with smaller trees, that he did not know whether any other employees had been asked to complete similar tasks, that he never started the planting at all, that he suffered no consequences for his refusal to complete the assignment, and that the assignment was completed by other employees under the same circumstances as he had been requested to do. The Main Building project cleaning assignment was likewise within Blake's job description, and he had been asked to perform similar projects in the past by his prior supervisor. (Docket No. 34-1, at 41.) Accordingly, Blake has failed to submit any evidence to support his position that these incidents constitute adverse employment actions. Blake has not established a

prima facie case of retaliation and I grant Defendant's motion to dismiss Count II of the (Second) Amended Complaint.[6]

### 3. Johnson's Race Discrimination Claim (Count IV)

Count IV of the (Second) Amended Complaint alleges that Johnson suffered race discrimination based on her familial association and disparate treatment based on her gender. In opposition to Defendant's motion for summary judgment, Johnson argues that "Ukasik treated her differently, even though she is a white woman, because of her biracial daughter and grandchildren" and that "[r]ace forms the underlying basis for all of the Plaintiffs' claims." (Pl. Br. at 13, 21.) At no point in her opposition to summary judgment does Johnson argue or support her claim for gender discrimination. Accordingly, I find that Johnson has abandoned any such claim, and turn my attention to her remaining claim for discrimination based on familial association.

Johnson argues that Ukasik discriminated against her because she has a biracial daughter and grandchildren.[7] She testified that on the few occasions when her daughter came to her workplace, Ukasik would look at her daughter "funny" and shrug and walk away. She claims

---

[6] Even if Blake had presented a prima facie case of retaliation, Defendant has proffered legitimate, non-discriminatory reasons as to why Blake was assigned to plant the trees with the tools provided and why he was asked to do project cleaning. Plaintiff has submitted no evidence casting a doubt on the veracity of Defendant's proffered reasons. For this additional reason, Defendant is entitled to summary judgment dismissing Blake's retaliation claim.

[7] Plaintiff relies on a case decided by the Sixth Circuit holding that a Title VII race discrimination claim may be based on familial association with a protected class. See Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc., 173 F.3d 988, 994-95 (6th Cir. 1999). This issue has not been addressed by the Third Circuit. See Young v. St. James Mgmt., LLC, 2010 WL 4290165, at *7 (E.D. Pa. Oct. 29, 2010) ("The Third Circuit has not ruled on whether discriminating against a person because of an interracial relationship constitutes race discrimination under Title VII."). Because Defendant does not challenge Johnson's legal right to assert such a claim, and because I am deciding the claim on other grounds, I need not reach this issue for purposes of Defendant's motion for summary judgment.

that when she showed photographs of her biracial grandchildren to her co-workers, Ukasik made a sound of "dislike and bigotry," gave her a sour look, would roll his eyes and walk away. Johnson further testified that she overheard from twenty feet away Ukasik use the term "Buckwheat" once in reference to Blake during a conversation with Zarak and in the fall of 2008, she heard Ukasik use the term "nigger." She was told by Connie Hopkins that Connie overheard Ukasik comment before Johnson transferred to his department that he did not want her in his department.

Defendant argues that Johnson, like Blake, presented no evidence that she suffered an adverse employment action as a result of any purported discrimination. Johnson admits that in the over seven years she has worked with Ukasik as her supervisor, he has never issued a warning letter to her, suspended her, demoted her or denied her overtime. (Docket No. 34-2, at 32.) Instead, Johnson argues that she was subject to monthly disciplinary conferences when she had not violated any rules, that Ukasik berated her in front of co-workers based upon insignificant or non-existent grounds, she was burdened with harsh work assignments and that Ukasik overly monitored her work and whereabouts. (Pl. Br. at 13.) Such actions, even if supported by the record, are not sufficiently adverse to meet Johnson's burden under Title VII. See Mihalko v. Potter, 2003 WL 23319594, at *2, 6 (W.D. Pa. Dec. 12, 2003) (denying leave, issuing warnings, monitoring plaintiff at work, forcing plaintiff to work in an unheated room and ordering employees not to speak to plaintiff do not amount to adverse employment actions); Pagan v. Holder, 2010 WL 3905368, at *5 (D.N.J. Oct. 5, 2010) (granting summary judgment dismissing discrimination claim on grounds that "series of workplace slights and petty grievances" "taken individually or collectively do not constitute an adverse employment action"); Nagle v. RMA, 513 F. Supp.2d 383, 391 (E.D. Pa. 2007) (performance criticisms by

supervisor followed by tense and uncomfortable working environment is not an adverse employment action).

Because Johnson, like Blake, has failed to demonstrate an adverse employment action taken against her, I grant Defendant's motion for summary judgment dismissing Johnson's discrimination claim.

### 4. Johnson's Title VII Retaliation Claim (Count V)

Johnson argues (collectively with her co-Plaintiffs) that she was retaliated against "in that their work assignments became burdensome, they were subjected to unnecessary supervisory monitoring, or because of negative employment evaluations." (Pl Br. at 22.) Applying the legal standard set forth in subpart III(B)(2) above, I find that Johnson has not met her burden of demonstrating that she suffered a materially adverse action in retaliation for her protected activity.

Johnson filed her first administrative charge on December 22, 2008. Her only negative performance evaluation occurred on October 22, 208, *prior* to her protected activity. Moreover, Johnson testified that the treatment of which she complains began on the very first day of her employment in the maintenance division. See Docket No. 34-2, at 12 (Ukasik was retaliating "from the first day I was hired"). For instance, "from day one. . .he would berate me in front of all the other employees," and beginning in 2002 he would call her into his office for monthly disciplinary talks. (Id. at 28.) Actions which occurred prior to the protected activity may not form the basis of a Title VII retaliation claim. See Slagle v. County of Clarion, 435 F.3d 262, 265 (3d Cir.)(Title VII plaintiff must show that adverse action occurred "either after or contemporaneously" with protected activity), cert. denied, 547 U.S. 1207 (2006).

Johnson's claims regarding close supervision and the tree planting incident fail for the same reasons that Blake's identical claims were insufficient to meet his burden. The tree planting and project cleaning incidents occurred in March and July 2009, respectively, three and six months after she had filed her administrative charge. "[A] gap of three months between the protected activity and the adverse action, without more, cannot create the inference of causation and defeat summary judgment." Leboon v. Lancaster Jewish Community Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007), cert. denied, 553 U.S. 1004 (2008). On the record before me, there is no "more." Johnson admits that being asked to plant the shrubs and trees was within the scope of her normal job duties, as was the nature of the work involved in the project cleaning. (Docket No. 34-2, at 26, 34.) She further testified that she had been found sleeping in her buildings in the past, and that if her supervisor wanted to observe her performance, he could not announce his presence in advance. (Id. at 29.) There is simply no evidence that Plaintiff suffered any adverse action, let alone that it was as a result of retaliation. Accordingly, Defendant's motion for summary judgment dismissing Count IV of the Complaint is granted.

### C. Hostile Work Environment

In Count VI of the Complaint, all the Plaintiffs[8] assert claims for hostile work environment until Title VII. To establish a hostile work environment claim under Title VII, a

---

[8] While the (Second) Amended Complaint asserts a claim for hostile work environment on behalf of Zarak, Defendant correctly argues that Zarak, as a Caucasian male, may not assert such a claim based on the purportedly racially hostile work environment directed against his African-American co-workers. See Longoria v. N.J., 168 F. Supp.2d 308, 318 (D.N.J. 200) (Hispanic police officer lacked standing to assert claim for hostile work environment based on racist comments directed at African-American co-workers). Defendants correctly point out that Zarak's hostile work environment claim, in fact, undermines his co-Plaintiffs' argument that the purported hostile work environment was based on race. In opposition, Plaintiffs do not address this issue. Accordingly, to the extent that Zarak has asserted a claim alleging a hostile work environment, I grant summary judgment for Defendant dismissing the claim.

plaintiff must demonstrate the following: (1) that he or she suffered intentional discrimination because of race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. Jankowski v. Sage Corp., 2010 WL 1253544, at *7 (W.D. Pa. Feb. 23, 2010) (citing Theriault v. Dollar General, 336 Fed.Appx. 172, 174 (3d Cir. 2009)). "In employing this standard, a court must evaluate the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance." Exantus v. Harbor Bar & Brasserie Restaurant, 386 Fed.Appx. 352, 354 (3d Cir. 2010). "Title VII is not violated by mere utterance of an epithet which engenders offensive feelings in an employee or by mere discourtesy or rudeness, unless so severe or pervasive as to constitute an objective change in the conditions of employment." Id. Defendant argues that Plaintiffs have failed to present sufficient evidence to support their hostile work environment claims. I agree.

Plaintiffs argue, without citation, that "[t]he work environment, as a matter of course, was infested with racist animosity engendered by Ukasik directed at Blake and Johnson which Penn State upon innumerable complaint failed to abate" and that "intolerable working conditions existed whereby a supervisor openly engaged in racist conduct." (Pl. Br. at 10, 23.) These assertions are unsupported by the record.

Blake testified that he heard Ukasik refer to him as "Buckwheat" only once back in 2000.[9] Zarak testified that Ukasik spoke to Blake "in a demeaning tone" and "like a child."

_____

[9] In fact, the record is unclear as to whether Blake actually heard the remark, or was only told it had occurred. (Docket No. 34-1, at 30.)

(Docket No. 34-3, at 12.)  Johnson testified that Ukasik gave her a "sour look" and walked away when she was showing off pictures of her bi-racial grandchildren.  She further testified that Ukasik "made a sound of dislike and bigotry" and that he would roll his eyes when she showed the pictures.  She testified that she heard him use the word "nigger" in 2008, but she failed to include it in her complaint to the EEOC and never complained about it.  Connie Hopkins told Johnson that she had overheard Ukasik state that he did not want Johnson in his department, but Johnson does not know the basis of the remark or when it was made.  (Id. at 104-06.)

Apart from these few examples, the record reflects that, while there was a lot of gossip at work regarding Ukasik's behavior, such behavior was not directed at Plaintiffs and generally impacted all the employees to varying extents.  Blake never heard Ukasik use the term "nigger." Indeed, before Ukasik became his supervisor, Blake was invited to be in Ukasik's wedding party and accepted.  Blake has never been threatened by anyone.  (Docket No. 34-1, at 61.)  Although Blake complained that a co-worker, Bill McClelland, had a picture of a black man modified to look like a devil on his desk, the picture actually depicted Steelers' coach Mike Tomlin breathing fire at the prospect of facing another team.  (Id. at 63.)  Neither Blake nor Johnson witnessed the so-called "Aunt Jemima" incident involving the student worker.  (Id. at 26; Docket No. 34-2, at 12.)  Even the witnesses who testified that Ukasik used racially derogatory terms emphasized that Ukasik made a point of only using such terms in private conversation with those individuals. This evidence simply does not rise to the level of severe and pervasive required to support a hostile work environment claim.  See, e.g., Dreshman v. Henry Clay Villa, 733 F.Supp.2d 597, 15 (W.D. Pa. 2010) (granting summary judgment dismissing hostile work environment claim where "[t]he incidents alleged were largely verbal comments directed toward Plaintiff and, while the content of the statements were sometimes offensive and their utterances entirely

unprofessional, 'the mere utterance of an epithet, joke or inappropriate taunt that may cause offense, or simple teasing, offhand comments, and isolated incidents (unless extremely serious),' are not sufficiently severe or pervasive to be actionable")(citations omitted).

Moreover, plenty of other employees suffered as a result of incidents involving Ukasik, without any evidence that such incidents resulted from racial hostility. Donna Ondo testified that Ukasik removed the wheels from her office chair, risking a serious fall. Blake testified that he believed Ukasik had put a nail or screw in Donna Ondo's tire. McCusker testified that Ukasik "goes around trying to get people." He further opined that Ukasik was doing a "below poor" job running the department and that his behavior spanned the gamut of all the workers, including McCusker. Zarak testified that he believed Ukasik had flattened Peggy Signorella's tires. He further stated in his filings with the EEOC that Ukasik tried to sell prescription drugs to McCusker, who had just returned to work from rehabilitation for drug addiction, and had physically assaulted a female office worker by placing his hands on her throat, choking her and making her cry. (Docket No. 36-23, at 6-7.) Karen Wechoski testified that Ukasik pulled out a knife and asked her to slice his throat with it. (Docket No. 34-4, at 14.)

The evidence reflects that Ukasik treated many of his employees poorly, regardless of their race. "[A]n employer which *indiscriminately* subjects its employees to a hostile work environment commits no violation of Title VII. . .or the PHRA." Hubbell v. World Kitchen, LLC, 688 F. Supp.2d 401, 419 (W.D. Pa. 2010) (granting summary judgment dismissing hostile work environment claim); see also, Connell v. Principi, 2007 WL 3274185, at *14-15 (W.D. Pa. Nov. 5, 2007) (granting summary judgment dismissing hostile work environment claim where evidence showed conduct was directed at both men and women), aff'd, 318 Fed.Appx. 75 (3d Cir. 2009). In short, the record before me reflects that Ukasik may have been a poor manager

who did not treat his subordinates appropriately, but it does not reflect that such behavior was motivated by discrimination, or that it was so severe and pervasive with respect to Plaintiffs as to rise to the level of a hostile work environment. Accordingly, I grant Defendant's motion for summary judgment dismissing Count VI of the (Second) Amended Complaint.

### D. Zarak's Title VII Retaliation Claim (Count VII)

Zarak asserts that, as a result of his multiple complaints to both Defendant and administrative agencies regarding Ukasik's purported discrimination against Blake and Johnson, he suffered retaliation in the form of changes in job duties, more onerous or less desirable jobs, more intensified work monitoring and exclusion from work meetings or job related activities. (Pl. Br. at 21-22.) More specifically, Zarak identified several examples of retaliation during his deposition: (1) he was assigned to do the tree planting; (2) Ukasik intentionally failed to give him all the information he needed to set up rooms; (3) a surveillance camera was placed in his office; (4) he was not notified that the locks had been changed on a storeroom door; and (5) Ukasik played "mind games" with him by giving him contradictory orders. (Docket 34-3, at 20, 25-26, 28, 31)

Plaintiff cites to no record evidence, and in my review of the record, I did not find any support for Zarak's assertion that his job duties changed, that he was assigned onerous or less desirable jobs (apart from the tree planting) or that he was excluded from work meetings or job related activities which he was entitled to attend. As discussed above with respect to Blake and Johnson, Zarak does not dispute that the tree planting assignment was within his job duties (id., at 20-21), and the so-called "mind games" do not rise to the level of a materially adverse action for purposes of retaliation.

With respect to the remaining examples of retaliation, their timing is not suggestive of a

causal link with Plaintiff's protected activity. Zarak filed intake questionnaires and/or charges of discrimination with the EEOC on December 22, 2007, February 25, 2008, August 17, 2009 and September 3, 2009. From a timing perspective for purposes of establishing a causal link, Zarak testified that from the beginning of Ukasik's tenure as supervisor, Ukasik frequently did not provide Zarak with all the information Zarak needed to perform some aspects of his job, although that omission occurred more frequently beginning in mid-2009. (Id. at 26.) The tree planting incident occurred in July 2009 and the surveillance camera was placed and the locks were changed on August 27, 2009. These incidents occurred over a year and half after Zarak began complaining of discrimination, so likewise do not support an inference of causation.[10]

Even if Zarak had demonstrated a causal link between his filings and the retaliatory conduct of the tree planting, surveillance camera and lock change, Defendant has submitted evidence of a legitimate, non-retaliatory reason for the conduct at issue. Zarak admits that he, Blake and Johnson were the only maintenance employees available to plant the trees and shrubs, and that Defendant's concerns that power equipment might hit underground cables and pipes in the area was legitimate. (Docket No. 34-3, at 20.) The Chief of Police for the campus submitted an affidavit attesting that the surveillance camera was placed after a year of complaints, most recently in August 2009, by Ukasik and Donna Ondo that the desk and filing cabinets in the office had been unlocked and personnel files of physical plant employees had been found disturbed. (Docket No. 33-43, at 3-4.) The lock on the storeroom was changed, not at Ukasik's request, but as a continuation of its then-existing program of recoring and rekeying locks

---

[10] While the latest incidents occurred only ten days after one of the EEOC charges was filed, where a plaintiff files multiple charges over many years, temporal proximity to one charge does not provide an inference of causation. Cardenas v. Massey, 269 F.3d 251, 264 (3d Cir. 2001).

throughout the entire campus.  (Id. at 4.)  Indeed, Plaintiffs admit that Defendant's reasons for installing the surveillance camera and changing the locks are legitimate.  (Docket No. 39, at ¶¶ 206-19; Docket No. 45 at ¶¶ 35-36.)  Plaintiffs have submitted *no* evidence upon which a reasonable fact finder could conclude that Defendant's reasons for its conduct were a pretext for retaliation.  Indeed, in their opposition brief, Plaintiffs fail to address this evidence in any manner.

Because Zarak failed to meet his prima facie burden with respect to his claim of retaliation and failed to raise an issue of fact with respect to Defendant's legitimate reasons for the purported retaliatory conduct, I grant summary judgment dismissing Zarak's claim for retaliation.

## Conclusion

Based on the foregoing, I grant Defendant's motion for summary judgment dismissing the (Second) Amended Complaint in its entirety.

## ORDER OF COURT

Having carefully considered Defendant's motion for summary judgment [Docket Nos. 33-39], Plaintiffs' opposition thereto [Docket Nos. 42-43, 46] and Defendant's reply [Docket Nos. 50-51], it is hereby ORDERED that Defendant's motion for summary judgment is GRANTED.

Dated:  March 8, 2011

BY THE COURT:

/s/Donetta W. Ambrose
Donetta W. Ambrose,
Senior U.S. District Judge
